# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Brief September 18, 2012

## OSCAR TORRES v. STATE OF TENNESSEE

### Direct Appeal from the Circuit Court for Blount County
### No. C-17913     David R. Duggan, Judge

---

### No. E2012-00453-CCA-R3-PC - Filed March 8, 2012

---

The petitioner, Oscar Torres, appeals the denial of his petition for post-conviction relief. The petitioner is currently serving an effective twenty-year sentence in the Department of Correction following his conviction for two counts of rape of a child, Class A felonies. On appeal, he contends that the post-conviction court erred by denying his petition for relief because he received ineffective assistance of counsel. Specifically, he contends that trial counsel was ineffective for: (1) failing to object during jury-out hearings to recalling the victim as a rebuttal witness; and (2) failing to call an expert witness pertaining to the faultiness of the memory of a child witness. Following review of the record, we find no error and affirm the denial of the petition.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and JAMES CURWOOD WITT, JR., JJ., joined.

Ashley Morris, Maryville, Tennessee, for the appellant, Oscar Torres.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Matthew Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Procedural History and Factual Background

The relevant acts committed by the petitioner which underlie his convictions, as recited by this court on direct appeal, are as follows:

The [petitioner's] wife provided babysitting services in her home for the three-year-old victim . . . from October 2003 until September 2004, when the victim disclosed to her parents that the [petitioner] had sexually abused her. Following an investigation, the [petitioner] was indicted for two counts of rape of a child . . . and one count of aggravated sexual battery . . . .

The victim testified at the August 22-24, 2006, trial that she was five years old and had just started kindergarten. Referring to her vagina and the penis as their "pee-pees," she testified that while she was alone with the [petitioner] in his bedroom, the [petitioner] gave her a "bad touch" on her vagina with his finger, which hurt her. She said that she and the [petitioner] had their clothes off and were together on his bed, with the [petitioner] sitting and her standing. The [petitioner's] penis was "hard" and "pee" came out of it and went into the sink and on her hair, where it felt "[s]ticky." The victim testified that the [petitioner's] "pee: also went into her mouth. She stated that when he placed his penis in her mouth, the petitioner told her to "suck it like a baby bottle." The [petitioner] told her not to tell anyone, but she later told her parents. The victim was unable to identify the [petitioner], even after being asked to stand in the witness box, testifying that she did not see him in the courtroom. She further testified, however, that he was married to her babysitter, Kim, and that he was bald. She said that the [petitioner] often babysat her while Kim was at work and that no one other than the "petitioner" had ever given her a "bad touch."

On cross-examination, the victim testified that she took her clothes off in the [petitioner's] bedroom ten times, or every time that she was at the [petitioner's] house. Each time, the [petitioner] also took his clothes off and gave her a "bad touch" on her vagina. Her vagina did not bleed when the [petitioner] hurt her by touching it. The [petitioner's] "pee" was green and "a lot" of it went in her hair. Her clothes were on when the [petitioner] put his penis in her mouth and off when the [petitioner] touched her vagina. On redirect examination, the victim clarified that it was the inside of her vagina where the [petitioner] touched her with his finger. She said that she pulled the [petitioner's] "pee" out of her hair. She stated that the [petitioner] touched her vagina several times but placed his penis in her mouth only once. When questioned by the trial court, the victim testified that the episodes where the [petitioner] placed his penis in her mouth and touched her vagina with his finger occurred on the same day.

-2-

. . . [T]he victim's father, testified that he had two children, a son who was three years old, and the victim, who would be six years old in October. From October 2003 until September 2004, he and his wife employed the [petitioner's] wife, Kim Torres, who came highly recommended by his wife's coworker, as a babysitter for the victim and her younger brother. He said that they took their children to Torres' house, where she kept them with her three boys, who were approximately six, three, and two years old. His wife usually dropped the children off between 8:00 and 8:30 a.m., and he picked them up between 3:00 and 3:30 p.m. [The victim's father] said that there were a few occasions when the [petitioner] was home alone with the children when he arrived in the afternoon to pick them up. He stated that, toward the end of the period in which Mrs. Torres babysat the children, she informed them that the [petitioner] had had knee surgery and would be home from work for several weeks. She additionally informed them that she had started night school and would have to leave home approximately an hour before [the victim's father] arrived to pick up the children.

[The victim's father] testified that he and his wife stopped taking the children to the Torres' home in September 2004 after the victim made a revelation about the [petitioner] to them. Until that point, the [petitioner] had seemed like a "nice person" to him, and he and his wife had never had any problems with either him or Mrs. Torres. He said that the victim made her disclosure at approximately 7:00 a.m. on a Saturday following a Friday afternoon when the [petitioner] had been home alone with the children when [the victim's father] arrived to pick them up. One to two weeks prior to that time, the victim had begun waking in the middle of the night with nightmares. In addition, she had started touching her genitalia on the outside of her clothing, which she had never done before. [The victim's father] testified that the victim had never surprised him and his wife during an intimate moment and had never seen him naked.

On cross-examination, [the victim's father] acknowledged that he never noticed anything unusual about the children when he picked them up from the [petitioner's] home. He recalled that the [petitioner's] knee surgery was three to four weeks prior to September 17, 2004, and said that after the surgery the [petitioner], who was wearing a knee brace and using crutches, was home with the children when he arrived to pick them up. On redirect examination, he testified that there were also times prior to the [petitioner's] knee surgery when he found the [petitioner] watching the children when he arrived at the Torres' home.

Detective James Wilson of the Blount County Sheriff's Department testified that he participated in the investigation of the case and was present

when the victim was interviewed at the Department of Children's Services. He identified the [petitioner] in the courtroom and said that his appearance, including his "very short hair," was substantially similar to his appearance at the time of his arrest. On cross-examination, he testified that the victim was interviewed on the afternoon of September 20, 2004, and received a medical examination the following day.

Dr. Jeffrey Abrams, a pediatric emergency room physician, testified that he performed a medical examination on the victim on September 21, 2004, which included a pelvic examination using a colposcope or magnifying camera. He said that the victim had no external lesions, but he noted a slight redness of her hymen as well as a small notch at the 1:30 position and a "fairly significant size notch" at the 3:00 position. According to Dr. Abrams, notching signifies a prior tear or laceration that has healed, which is "indicative of prior trauma" and, depending on the size of the notch, indicative of "penetrating trauma, possible abuse." On cross-examination, he testified that he was unable to tell when or how the notching had occurred. He assumed that there would have been bleeding at the time of the trauma that resulted in the larger notch but could not be certain.

Following Dr. Abrams' testimony, the State rested its case-in-chief subject to the right to recall the victim, who had since returned to her kindergarten class, in response to a juror's question about her identification of the [petitioner]. The trial court granted the [petitioner's] motion to dismiss the aggravated sexual battery count of the indictment and the [petitioner] then presented his proof, which consisted of the testimony of himself and his wife.

The thirty-two-year-old [petitioner] testified that he had been married for almost twelve years and had three sons who were eleven, eight, and six years old. He said he had served six years in the United States Air Force and was employed as a jet engine mechanic at Standard Airlines in Maryville. During most of the time in which his wife babysat the victim, he was working the 7:00 a.m. to 3:30 p.m. shift and saw the victim only briefly when he came home for lunch or as she was leaving with one of her parents when he arrived home at the end of his work day. On August 20, 2004, he had knee surgery, which required him to stay home from work until the middle of October. However, he rarely saw the victim during that period, as he spent most of his time in bed. The [petitioner] testified that he wore a locking knee brace, used crutches, and required the assistance of his wife when getting out of bed or going to the bathroom. He said that he never touched the victim inappropriately and had no idea why she had made the allegations against him. He stated that his wife was the one who babysat her, and he had very little contact with the victim. On cross-examination, the [petitioner] testified that

-4-

he was never in charge of the babysitting and was never home alone with the victim.

The [petitioner's] wife, Kimberly Torres, corroborated the [petitioner's] testimony that he spent most of his time in bed following his knee surgery. She said that he was unable to stand without assistance, constantly wore a knee brace that kept his leg locked in a straight position, and was able to get around only on crutches. She stated that she was always at home when the victim and her brother were present and that she informed the victim's parents ahead of time whenever she had any appointments so they would know not to bring the children on those days. She testified that she never saw the [petitioner] behave inappropriately toward the victim and had never known him to be inappropriate with any child. She said that the only problem she had with the victim during the time she babysat her was the victim's habit of removing her clothing. However, when she told the victim to put her clothes back on, she always complied. On cross-examination, Mrs. Torres reiterated that the [petitioner] was never alone with the victim or her brother.

When called as a rebuttal witness and asked to stand up on the witness chair, the victim correctly identified the [petitioner], who had been moved from the defense table to a different position in the courtroom. On cross-examination, she testified that she had seen the [petitioner] in the courtroom on the previous day as well. Asked if someone had told her that the [petitioner] was "Oscar," she answered, "Yes," but when asked who had told her, she answered, "No one."

*State v. Oscar Torres, Jr.*, No. E2007-00867-CCA-MR3-CD (Tenn. Crim. App., at Knoxville, Apr. 14, 2008). Following the denial of his motion for new trial, the petitioner filed a direct appeal with this court challenging the sufficiency of the evidence and asserting that the trial court committed reversible error by admitting improper rebuttal testimony from the victim. *Id*. This court found that the evidence was sufficient and that, despite actual waiver of the issue, the trial court properly allowed the testimony. *Id*.

Thereafter, the petitioner filed a pro se petition, as well as an amended petition, for post-conviction relief alleging, among other grounds, that he was denied his right to the effective assistance of counsel. Following the appointment of counsel, a second amended petition was filed with the court. A hearing was held before the post-conviction court in December 2011, with trial counsel being the only witness to testify.

Trial counsel, who was licensed in 1973 and is the District Public Defender, testified that he was appointed to represent the petitioner in this case. He related that he had trial experience in this type of case and that he had received specialized training in how to prepare for and try these cases. He testified that he believed that these type of cases involving child rapes are the hardest type of cases to try. Trial counsel testified that it was extremely difficult to cross-examine young victims in these cases without enraging the jury. He further stated

that it was also critical in these cases that you ascertained the true facts from a defendant, as there was usually limited discovery and the victims were usually not available to be interviewed. Trial counsel stated that if you did not get the truth from the client, questioning witnesses was difficult because you did not know how they would answer the questions asked.

In this case, trial counsel testified that he spent hours preparing the case for trial. He indicated that he filed a request for a bill of particulars, and the State responded with an answer which complied with the law. However, because there was no specific time-frame given, the case was difficult to defend the case. Trial counsel also testified that there was no preliminary hearing and that discovery was limited. His investigator spoke with everyone who would speak with him, but he was not allowed to speak with the victim and knew little of the State's case going into the trial. Trial counsel was aware that the State had no conclusive DNA evidence and that the medical evidence was basically limited to an undatable notch in the victim's hymen. However, the petitioner would not give him a straight answer as to his guilt or innocence and refused to take a confidential lie detector test. Trial counsel informed the petitioner that he recommended that he accept an offer from the State to plead to aggravated sexual battery, but the petitioner adamantly refused to do so even when he was informed that it was not a winnable case. The strategy of the case was not to obtain a conviction of a lesser-included offense, but rather to show that no crime had been committed.

Trial counsel also related the circumstances in which the victim was recalled to the witness stand as a "rebuttal witness." He testified that just prior to the State's resting, a juror submitted a question regarding the victim's failure to identify the petitioner during her testimony. It was suggested that she be allowed to return to the stand and be placed in a different position because it was possible she had not been able to clearly see the petitioner because she was so small. A discussion was held among trial counsel, the State, and the trial court. Trial counsel testified that he did not really believe that it was proper to give the victim a second-go at identifying the petitioner, but it was clear that the trial court believed it was proper and that it was going to occur either before the State rested or as rebuttal. He noted that he might have objected had the trial court not have been so clear in its position. Trial counsel testified that he did think it was better for his case that it occur in rebuttal. Trial counsel did request, prior to the victim's retaking the stand, that the petitioner also be seated in a different spot in the courtroom than he had been the day previously.

Trial counsel acknowledged that he did not call an expert to testify regarding the faultiness of children's memories of prior events. He stated, however, that in his experience, it normally did not help. It gives the impression to the jury that the defense is badgering or attacking the credibility of the victim, towards whom the jury is inclined to be sympathetic. Trial counsel also stated that he did not think it would have made a difference in the case and, further, that he did not want to run the risk of the expert's supporting the victim's testimony during cross-examination.

-6-

After hearing the testimony and reviewing the evidence, the post-conviction court, by written order, denied the petition for relief. The petitioner has appealed that denial.

## Analysis

On appeal, the petitioner contends that the post-conviction court erred in denying his petition because he was denied his right to the effective assistance of counsel. Specifically, on appeal, he contends that trial counsel was ineffective by: (1) failing to object to the victim's being recalled as a rebuttal witness; and (2) failing to call an expert witness regarding the faultiness of the memory of a child witness.

In order to obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103 (2010); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687-88. Failure to satisfy either prong results in the denial of relief. *Id*. at 697.

For deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 687-89. "In other words, the services rendered or the advice given must have been below the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner must prove that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. When reviewing trial counsel's performance for deficiency, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably

based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceeding." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). However, "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Prejudice in turn requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In *Strickland*, the Supreme Court noted that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. The court clarified that prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns*, 6 S.W.3d at 461; *Grindstaff*, 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff*, 297 S.W.3d at 216. But the trial court's conclusions of law on the claim are reviewed under a purely de novo standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

As an initial matter pointed out by the State, the petitioner in this case failed to file a timely notice of appeal. A notice of appeal must be filed within thirty days after the date of entry of the judgment appealed from. Tenn. R. App. P. 4(a). In this case, the order denying the petition was entered on January 26, 2012, and notice of appeal was filed on February 28, 2012 - one day after the thirty-day time period to file an appeal had expired. In the reply brief filed with the appellate record, the petitioner's counsel acknowledges the late-filing and attributes it to a mathematical error. We note that "in all criminal cases, the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." *Id*. In the interest of justice and finality for the petitioner, we elect to review the issues raised on the merits.

## I. Victim as a Rebuttal Witness

The petitioner first alleges that trial counsel was ineffective for failing to object during the jury-out hearings to the victim being recalled as a rebuttal witness. He suggests that trial counsel should have objected to the victim's being given a second-chance to identify her attacker because without the identification, the evidence would not have given rise to a conviction. He acknowledges that trial counsel's failure to object resulted in waiver of the

-8-

issue on direct appeal and, further, that this court nonetheless reviewed the issue and found it moot, as it was within the discretion of the trial court whether to allow the witness to be recalled. However, he maintains that it was ineffective of trial counsel not to object and put forth arguments to sway the trial court's decision. The petitioner further faults trial counsel for suggesting that the procedural way to recall the victim was as a rebuttal witness. Finally, he urges that trial counsel should have objected during the final jury-out hearing when the trial court questioned the victim on the issue of her identification in a suggestive manner, resulting in an unconstitutional, unreliable identification. He argues that the identification of the petitioner by the victim was the lynch pin of the case, and trial counsel's failure to take any steps to bar its admission "amounted to a complete denial of any defense at all" for the petitioner.

In denying relief on this ground, the post-conviction court, in its written order, made the following findings:

> [Trial] counsel acknowledges that he should have objected and failed to do so. Indeed, the Tennessee Court of Criminal Appeals noted that Petitioner had waived this issue by the failure of his attorney, at trial, to make a contemporaneous objections.
>
> The inquiry, however, does not stop there. First, [trial] counsel raised this issue in a motion for new trial. In that motion, as amended, [trial] counsel presented the argument to the trial court that the victim should not have been allowed to testify a second time. . . .
>
> The motion for new trial was denied.
>
> Second, while the Tennessee Court of Criminal appeals noted that any objection had been waived because it was not made at trial, that court held that even if the issue had not been waived it was without merit, and given that questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and specifically the admission of rebuttal testimony lies within the discretion of the trial court.

We conclude that nothing in the record preponderates against the post-conviction court's findings that the petitioner failed to establish the prejudice prong of his ineffective assistance of counsel claim. Trial counsel acknowledged that he should have objected, but he maintained that the trial court clearly felt that the testimony was proper and that the victim was going to be allowed to retake the witness stand. Moreover, the entire record supports the post-conviction court's finding that, even if trial counsel had objected, it would not have been successful. The trial court allowed the testimony, the trial court denied a motion for new trial challenging the issue, and this court has previously determined that the issue was without merit. As such, the petitioner failed to establish that trial counsel's lack of objection resulted in prejudice to his case and is entitled to no relief.

## II. Expert Witness

Next, the petitioner argues that trial counsel was ineffective for failing to "call an expert witness to testify pertaining to the faultiness of the memory of a child witness." However, his argument and the cited caselaw in his brief refer to expert testimony on eyewitness identification. We assume that he is parlaying his argument that an expert regarding faulty memories would affect the victim's identification of the petitioner.

In denying relief on this issue, the post-conviction court noted:

> With respect to the specific suggestion that [trial counsel] should have tried to find an expert who could testify to the faultiness of a child witness's memory and weaknesses in a child's testimony, again based upon experience, such expertise simple does not seem to help. He testified his experience had been that if a child victim can tell a coherent story, there is a tendency of the jury to believe the victim and it doesn't help to put on such expert proof. He further testified that, based upon his experience, he does not believe it is wise to attack the credibility of a young person whom the jury has sympathy toward.

Again, nothing in the record preponderates against that finding. Trial counsel testified that, based upon his experience, he did not believe it a wise decision to enlist the aid of expert witnesses in these matters. He felt it would do little to help the defense and could lead to greater harm. That is a strategic decision made by trial counsel in his presentation of the case, and it should be given great deference on appeal. *See Hellard*, 629 S.W.2d at 9.

Trial counsel testified that he spent many hours preparing this case for trial. He acknowledged that he was somewhat hampered by the limited discovery in the case, the refusal of witnesses to speak with him, and the petitioner's own failure to cooperate with him in certain areas. The record establishes that trial counsel was placed in a precarious position when making his strategic decisions in this case, but that each decision was made after adequate investigation and preparation.

Moreover, the petitioner presented no such expert at the hearing to offer what might have been testified to at trial regarding the victim's memory based upon the testimony she gave. The court may not simply presume what testimony would have been given or what impact it might have had upon a jury. As such, the petitioner has failed to establish his claim and is not entitled to relief. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-10-